## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Angelo Karagelidis, | * | |
| Petitioner, Plaintiff, | * | |
| | * | |
| vs. | * | Civil No. **05-CV-11846-NG** |
| | * | |
| | * | |
| United States Department of Justice, | * | |
| Respondent, Defendant, | * | |

## PETITIONER'S TRAVERSE OF RESPONDENT'S OPPOSITION TO MOTION FILED PURSUANT TO 28 U.S.C. § 2241

Now Comes Angelo Karagelidis, proceeding In propria persona, in the above styled action and numbered cause, to be referred herein after as "Petitioner," respectfully moving this most honorable court with his Traverse of "Respondent's Memorandum In Support Of Motion To Dismiss Claim As Moot and For Failure to State a Claim upon which Relief may be Granted," in reply to petitioner's motion to correct and/or modify the judgment of conviction and sentence, pursuant to the provisions of 28 U.S.C. § 2241.[1] In support of this Traverse petitioner hereby avers as follows:

The petitioner has raised a claim under the provisions of Title 28 U.S.C. § 2241, after exhausting his administrative remedies in the Federal Bureau of Prisons ("FBOP"), to challenge and correct the effect of events that became apparent 'subsequent' to his conviction and imposition of sentence. Section 2241, has been established as a separate statutory enactment, as such it is entitled to its own reading, and should not be constrained by case law previously articulated for § § 2254 and 2255 cases. The need for deterrence to adverse actions in a prison

---

[1] 28 U.S.C. § 2248 states: "The allegations of a return of the Habeas Corpus or an answer to an order to "Show Cause" in a Habeas proceeding if not traversed shall be accepted as true."

1

environment is paramount, and 2241 is a continuing mandate from Congress, that insures all sentences be carried out appropriately, and in accordance with the constitutional protections provided.

Contrary to the AUSA'a assertion, the Department of Justice ("DOJ"), is in fact the correct respondent, as it is the department, incorporated with its subordinate Federal Bureau of Prisons ("FBOP"), which has custody and control over petitioner. Although petitioner is currently in the Community Corrections Center ("CCC"), he is still under the custody, care and supervision of the FBOP. It is not petitioner's current placement that is the issue of concern, but the fact that the respondent has initiated an action that adversely affects the manner in which petitioner's sentence is being carried out. Namely, the application of the Greater Severity Public Safety Factor Variable ("PSFV") has affected petitioner's custody level classification, based upon respondent's interpretation of ambiguous and unconstitutionally recognized factors attributed in the PSR.[2]

## THE GOVERNMENT'S ATTEMPT TO DISMISS PETITIONER'S 2241 PLEADING AS MOOT LACKS MERIT

Respondent's assertion that petitioner's habeas claim is moot lacks merit. Although petitioner is currently in the Community Corrections Center ("CCC"), he is still under the purview of the Department of Justice's ("D.O.J"), FBOP, and his custody level apparent in his central file continues to have him listed with a PSFV of Greater Severity. The CCC staff is continuing to utilize petitioner's Presentence Investigation Report ("PSR") and the information contained therein. As demonstrated in Vencor Inc. v. Webb, 33 F.3d 840 (7th Cir. 1994), a heavy burden of proof rests on party suggesting mootness.

---

[2] Mr. Karagelidis was not indicted under the leadership role, by the grand jury or convicted by the trial jury beyond a reasonable doubt for in compliance with the Sixth Amendment. United States v. Booker, provides the relevant precedence to support Karagelidis claim, as the PSR is ambiguous as it describes the area of culpability, so much so that it allows the FBOP to interpret the most severe reading in applying the PSFV.

2

There are two compelling reasons why this writ of habeas corpus is not moot and is properly before this court: 1) it cannot be said with assurance that there is no reasonable expectation that alleged violations will recur and; 2) Although petitioner is in a CCC, this event has not completely and irrevocably eradicated the effects of the alleged violation. Had it not been for the placement of the PSFV of Greater Severity petitioner would have been placed in a prison camp, and have been afforded home confinement, instead of the 6 months CCC placement, which still confines him to the custody and care of the FBOP, who continues to maintain his central file and application of the PSFV. See County of Los Angeles v. Davis, 440 U.S. 625, 59 L.Ed 2d 642, 99 S.Ct. 1379 (1979). It is compelling to note that the AUSA maintains that respondent has appropriately placed the PSFV. During the term of petitioner's 3 year supervised release the potential exists that if petitioner is returned to the FBOP for some unforeseen reason he will be subject to the same PSFV.

The power and authority of the court generally, under proper circumstances, judgments of a court of record are subject to be opened up, modified, corrected, set aside and vacated. The power of the court so to act has always been exercised in the judicial discretion of the court. Here, petitioner has invoked jurisdiction of the court to so act pursuant to a writ of habeas corpus under § § 2241 and 1331.[3]

### PETITIONER HAS A PROTECTED LIBERTY INTEREST WHEN EXPRESSLY TOLD BY DOJ OFFICIALS THAT HE COULD EARN MINIMUM CUSTODY PLACEMENT

The petitioner has argued that decisions contrary to assurances made by DOJ officials and adverse to his liberty interest, have justified the action currently before this court. This argument is premised on the fact that petitioner was told verbally, and through writing, that he

---

[3] 28 U.S.C. § 2241 is the proper avenue, where petitioner has exhausted his administrative remedies, regarding actions of the prison system; thereby seeking the issuance of a writ of habeas corpus to correct said adverse action.

3

would be able to earn custody level reductions for demonstrating a positive institutional adjustment and rehabilitation. To earn these reductions he would have to "comply with established program objectives by maintaining clear conduct; demonstrating positive personal growth, through taking Adult Continuing Education courses; obtain good work performance ratings; and complete payment for his Court imposed Special Assessment, through the Financial Responsibility Program ("FRP")." [4]

After arriving at the Federal Medical Center ("FMC") Devens, in Ayer, Massachusetts, petitioner's custody level was reduced as low as 9 points, for demonstrating responsibility, and a continuing effort at maintaining his program responsibilities. On or between September 13, 2004, and February 2005, petitioner inquired as to why his custody level had not been further reduced. He was then instructed by his case manager, that his custody level will never go below 6 points, because of a Public Safety Factor Variable ("PSFV") Greater Severity placement, derived from the "enhancements for the Leader/Organizer role and drug amount attributed from the Presentence Investigation Report" ("PSR").[5]

It is argued that constitutionally protected 'liberty interest" in custody and confinement classifications are created by regimes which in the end effectively say: "If fact A, B, and C are established in an appropriate fact finding process, you are thereupon legally entitled to a more favorable security custody classification than you presently have." See Slezak v, Evatt, 21 F.3d 590 (4th Cir. 1994). Its effect must be to "plac[e] substantive limitations on official discretion to "legitimate claim[s] of entitlement," to classification sought and administratively denied. [6] With this line of reasoning, petitioner can effectively demonstrate "legal entitlement" to due process,

---

[4] An inmate has the right to expect prison officials to follow its policies and regulations. See Caldwell v. Miller, 790 F.2d 598 (7th Cir. 1986); and Payne v. Block, 714 F.2d 1050 (11th Cir. 1984).

[5] Mr. Karagelidis was not made aware of this change in his custody status determination during the time he actioned towards earning the minimum out custody level toward camp placement.

[6] Also See Lanier v. Fair, 876 F.2d 243 (1st Cir. 1989); and Brennan v. Cunningham, 813 F.2d 1 (1st Cir. 1987).

4

within the protectional guards of the United States Constitution, and "legal entitlement" to a standard of proof that maintains a constitutional degree of correctness is to be exercised by the FBOP, in determining the manner in which the sentence will be carried out.[7]

### PETITIONER'S CUSTODY LEVEL CLASSIFICATION SHOULD BE BASED ON CONSTITUTIONALLY ACCURATE, RELIABLE AND UNAMBIGUOUS INFORMATION

The compelling issue in regards to the application of the Greater Severity PSFV against petitioner is that it has been applied by the FBOP in a manner that violates petitioners right to due process under the Sixth Amendment, and its effects have caused a viable liberty interest concern. The first concern is the fact that the PSR is ambiguous as it describes the area of culpability attributed towards petitioner, because it allows the DOJ the ability to interpret and apply the most severe reading in its application of the PSFV.

Justification for the PSFV by the DOJ (FBOP and U.S. Attorney's Office), is said to be factored from the enhancement portion of the PSR, which could reasonably be argued, was invalidated by the Supreme Court with the Blakely/Booker, pronouncement.[8] If the Court as reasoned in Blakely/Booker, is without authority to impose the enhanced penalties in question, then arguably so, the same should hold true for the DOJ's acts subsequent to the imposition of the sentence, to apply additional enhanced penalties based on the very same means.[9] This argument is even more compelling, after reviewing the DOJ's acknowledgment of the implications of Booker, in its Memorandum dated December 3, 2004.[10]

---

[7] Mr. Karagelidis asserts that without the PSFV Greater Severity, his custody level points would be below 5 points (possibly 2 points at this time), based on what he was led to believe would bring him closer to progressing towards community based activities. See [PS 5100.07 Ch. 8, page 1 (1/31/2002)].

[8] Blakely v. Washington, 124 S. Ct. 2531 (2004); and United States v. Booker, ___ U.S.___ , 125 S. Ct. 738, 160 L. Ed 2d 621 (2005).

[9] Petitioner is currently serving the unconstitutional portion of his sentence, had he been afforded relief from the application of U.S. v. Booker, ___U.S. ___, 125 S.Ct. 738, 160 L.Ed 2d 621 (2005).

[10] See copy of Memorandum incorporated in the original § 2241 pleading.

In the sense that the reading of the statutory application of the United States Sentencing Guidelines ("U.S.S.G.") § 3B1.1 is ambiguous, the rule of lenity should govern, and the ambiguity should be held in favor of petitioner's argument for relief. In conducting a careful review of U.S.S.G § 3B1.1 entitled "aggravating role," the role in the offense affords three (3) areas upon which the Court may determine an increase in the offense level:[11]

    (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels;

    (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels;

    (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

Although the sentencing guidelines are now deemed advisory, there remains a compelling problem such as the one demonstrated here, by which petitioner is being subjected to. This concern is demonstrated in the fact that the respondent has found an even greater culpability than the sentencing court did in attributing the role in the offense adjustment. To clarify this assertion, we see that the court attributed 2 levels, in accordance with U.S.S.G. § 3B1.1(c). The ambiguity is found in the fact that (a) defines an "Organizer/Leader"; (b) defines a Manager/Supervisor", and (c) allows a broad interpretation and application by the respondent, to attribute enhanced culpability not found by the court at sentencing. In this sense, the statutory reading and application of § 3B1.1 is ambiguous, thereby invoking the rule of lenity to govern in favor of petitioner.

---

[11] Mr. Karagelidis does not waive the Sixth Amendment guarantee that culpability be found by facts admitted of found beyond a reasonable doubt.

6

Petitioner is exercising his right to take the appropriate action the Office of General Counsel of the DOJ has recommended. The DOJ has, and may continue to misinterpret the enhancement factors in the present PSR, in applying the PSFV against petitioner in an aggravating manner, up and until this honorable court moves to correct the manner in which a PSR, specifically petitioner's is interpreted. It is reasonably asserted that this pleading is properly before this Court to grant the relief under 28 U.S.C. § 2241.This would then afford the Probation Department the opportunity to make the appropriate corrections, in the interest of fairness and justice.[12]

### THE DEPARTMENT OF JUSTICE'S READING AND INTERPRETATION OF THE PSR WHICH JUSTIFIED THE PSFV OF GREATER SEVERITY IS IN ERROR AND RELIEF IS WARRENTED

Petitioner argues that DOJ officials have caused him to be denied a "liberty interest" concern, resulting from information inaccurately, and ambiguously interpreted from the PSR, or deemed unconstitutionally applied, in violation of the Sixth Amendment of the United States Constitution. At present, the PSR is being interpreted to the point where the DOJ has focused solely on the 1999 policy statement application.[13] The operational classification regulations being exercised by the DOJ, through interpreting the PSR is void of the link between the substantive predicates and the mandatory constitutional application.

---

[12] The Department of Justice Memorandum referenced herein, authorizes the relief requested by asserting: " ... **the Bureau does not have the authority to interpret the (Booker) opinion as it relates to your specific case. Again it will be up to you to petition the court that sentenced you ...**"

[13] A reading of the 2002 Change Directive to the Policy Statement of drug offenses, may clear up the effect imposed by the ambiguity.

In addressing the policy statement changes, respondent concedes there were changes made,[14] but ignores the full scope of the change, in the manner of determining a PSFV for Greatest Severity. For example PS 5100.07 (9/3/1999) states in part:

> "Any drug offender whose current offense includes the following criteria shall be scored in the Greatest Severity category:
>
> The offender was part of an organizational network and he or she organized or maintained ownership interest/profits from large-scale drug activity,
>
> **\*\*\* AND \*\*\***
>
> the drug amount equals or exceeds the amount below:
> ... Marijuana - greater than or equal to 620,000 gm, 620 K, or 1,367 lb..."[15]

The change directive to the policy statement on January 31, 2002, took a completely different approach, at the determining factors utilized to apply the PSFV for drug offenses.[16] The "high Drug" was removed from being a considering factor, and in that, the FBOP inserted a 2 page change that clarified who was to be considered an "Organizer/Leader" for the purpose of a PSFV for a drug offense.[17] In identifying petitioner's claim, we see that the PSR is ambiguous in its application of the leadership role adjustment. This is found in the reading of the PSR as confirmed by respondent:

> "...Thus, the defendant was an organizer, leader, manager, or supervisor in the Ecstasy conspiracy and the offense level is increased by two levels pursuant to U.S.S.G. § 3B1.1(c)."

The FBOP's custody classification manual separates each one of the listed categories according to seriousness. Under PS 5100.07 (January 31, 2002), Appendix G, page 1,

---

[14] The Department of Justice's FBOP issued a "Change Directive" on January 31, 2002, with an accompanying Table of contents is attached herewith.

[15] Only the drug type applicable to this case is quoted.

[16] See [PS 5100.07 CN-2 1/31/02, Appendix G, page 1].

[17] The 2002 PS instructs to: "Read the: 'Offense conduct' section of the PSI and any other available information to understand what the inmate did in the criminal activity. The functions are listed in descending order of SERIOUSNESS." There are preceding titles and descriptions that follow this application of the Greater Severity PSFV.

specifically lists who is to be considered as an "Organizer/Leader." Appendix G, page 2 has the determining factors as to who is not considered an "Organizer/Leader."[18] The ambiguity that allows the DOJ's application of the aggravating PSFV from the PSR, gives cause for the rule of lenity to govern the decision making function, thus invoking due process.[19]

The non-retroactive effect of Booker, as addressed by Respondent is of no concern, as this case challenges events subsequent to the conviction and sentence. For the sake of arguendo, it could be reasoned that although the Supreme Court made Booker, to "… apply today's holding … to all case on direct review," the section of that opinion which could reasonably be applied to the case at bar would be the pronouncement: "… with no exception for cases which the new rule constitutes a 'clear break' with the past.'" Quoting Griffith v. Kentucky, 479 U.S. 314, 328 (1987). This area of the Booker opinion, would lead one to reasonably infer to a situation as is presently before this court. This would be so, because a "clear break with the past" could be incorporated as a change in the FBOP's reading and adverse application of PSR enhanced factors, derived from its own December 3, 2004, Memorandum.

Petitioner concedes he was sentenced under a mandatory guideline structure prior to the pronouncement in Booker. The sentencing court's comments at sentencing, reflects that the court did not deem to have the authority to ignore the guidelines when it stated:

## CONCLUSION

The Supreme Court in Marbury v. Madison, 5 U.S. 137 (1803), questioned, "if a defendant has a right, and that right has been violated, do laws of this country afford him remedy?" [5 U.s. 137, 163]. It then went on to say:"The very essence of civil liberty certainly

---

[18] A Manager or Supervisor is not considered as an "Organizer/Leader" for the purpose of allying the PSFV of Greater Severity.

[19] See Little v. United States, 2002 WL 1424581 (D. Mass.) (Unpublished opinion).

consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." "While a lawmaker is entirely free to ignore ordinary meanings of words and make definitions of its own, that device may not be employed so as to change the nature of acts or things to which words are applied." See Carter v. Carver Coal Co., 298 U.S. 238, 56 S.Ct. 855 (1936).

To remedy the situation concerning "substantive predicates" used to govern the DOJ's official decision making, from factors interpreted in the PSR, it is respectfully prayed this Court compel a result that requires any result reached through the PSR is contingent upon a finding that constitutionally applied predicates are met. The constitutional predicate, which compliance is sought, is through the Sixth Amendment protection, a protection that culpability for subsequent sentencing enhancements be found at no lesser standard than required of the courts, to avoid a complete miscarriage of justice.

Respectfully,

Angelo Karagelidis, Pro se.
Coolidge House
307 Huntington Ave
Boston, MA. 02115

## CERTIFICATE OF SERVICE

I Angelo Karagelidis do hereby affirm and attest that I have mailed a copy of the attached motion to the office of the Respondent/Defendant's legal counsel at the Office of the U.S. Attorney, One Courthouse Way, Boston, MA. 02210, by first class pre paid mail on this 21th day of February 2006. Signed pursuant to the provisions of 28 U.S.C. § 1746.

Angelo Karagelidis, Pro se.

Cc: AK/pet

10



**U.S. Department of Justice**
Federal Bureau of Prisons

# Change Notice

**DIRECTIVE AFFECTED:** 5100.07
**CHANGE NOTICE NUMBER:** 2
**DATE:** 1/31/2002

1.  **PURPOSE AND SCOPE.**  To disseminate changes to the **Security Designation and Custody Classification** Manual.

2.  **SUMMARY OF CHANGES.**  The following text and procedural changes have been made:

- Information regarding the justification and recording of maximum custody changes has been added in Chapter 3.

- Chapter 3 is revised to specify that inmates in custody for a U.S. Parole Commission violator hearing should receive a designation to the nearest appropriate institution.

- New Public Safety Factors (PSFs) - Juvenile Violence Serious and Telephone Abuse have been added in Chapter 7.

- The Male/Female Inmate Load and Designation forms (BP-337 and BP-338) have been updated to include the Juvenile Violence and Serious Telephone Abuse PSFs.

- Text emphasizing the importance of resolving detainers and pending charges has been added to Chapters 8 and 9.

- Language clarifying state violations being held as a detainer has been added in Chapters 8 and 9.

- Requirements regarding unit staff completing an "exception memo" have been added in Chapters 8 and 9.

- A revision to Chapter 6 (female) on custody classification to coincide with similar text in the Chapter 5 (male) to allow staff to conduct a review earlier than 12 months to enable progress toward community activities.

- A change has been made to Chapter 10 to allow inmates to travel via unescorted transfer to a minimum security level institution.

- State referral procedures have been clarified in Chapter 10.

- Matrices for initial designation (Chapter 3) and redesignation (Chapter 10) have been added.

- The Special Instructions in Appendix B have been modified to clarify withheld adjudications and inmate identification.

- A new Appendix G has been added to define the role of drug offenders.

3. **TABLE OF CHANGES**

| Remove | Insert |
|---|---|
| Table of Contents | Table of Contents |
| Chapter 2, Pages 3-4 | Chapter 2, Pages 3-4 |
| Chapter 3, Pages 9-10 | Chapter 3, Pages 9-11 |
| Chapter 5, Page 17 | Chapter 5, Page 17 |
| Chapter 6, Pages 17-18 | Chapter 6, Pages 17-18 |
| Chapter 7, Pages 5-10 | Chapter 7, Pages 5-10 |
| Chapter 8, Pages 1-4 | Chapter 8, Pages 1-4 |
| Chapter 8, Pages 17-18 | Chapter 8, Pages 17-18 |
| Chapter 8, Pages 21-22 | Chapter 8, Pages 21-22 |
| Chapter 9, Pages 1-4 | Chapter 9, Pages 1-4 |
| Chapter 9, Pages 17-18 | Chapter 9, Pages 17-18 |
| Chapter 9, Pages 21-22 | Chapter 9, Pages 21-22 |
| Chapter 10, Pages 5-8 | Chapter 10, Pages 5-8B |
| Chapter 10, Pages 21-22 | Chapter 10, Pages 21-22 |
| Appendix B, Page 5 | Appendix B, Page 5 |
| | Appendix G |

Changes are noted by an (*) asterisk at the beginning and end of changed text. An asterisk may note added, revised, or deleted text.

4.  **ACTION.**  File this Change Notice in front of the Program Statement, Security Designation and Custody Classification Manual.


                                        /s/
                                        Kathleen Hawk Sawyer
                                        Director

```
╔═══════════════════════════╗
║     TABLE OF CONTENTS      ║
╚═══════════════════════════╝
```

Introduction . . . . . . . . . . . . . . . . . . . . . Chapter 1

Definitions . . . . . . . . . . . . . . . . . . . . . Chapter 2

Security Designation Procedures for New Commitments . . Chapter 3

Designation to Non-Federal Facilities . . . . . . . . . Chapter 4

Inmate Load and Security Designation Form   . . . . . . Chapter 5
    Instructions (Male) BP-337

Inmate Load and Security Designation Form   . . . . . . Chapter 6
    Instructions (Female) BP-337

Public Safety Factors and Management Variables  . . . . Chapter 7

Custody Classification Form Instructions Male (BP-338)  Chapter 8

Custody Classification Form Instructions Female(BP-338) Chapter 9

Inmate Transfer . . . . . . . . . . . . . . . . . . . . Chapter 10


Sentence Procedures . . . . . . . . . . . . . . . . . Appendix A

Offense Severity Scale  . . . . . . . . . . . . . . . Appendix B

Institution Missions  . . . . . . . . . . . . . . . . Appendix C

Waiver for Misdemeanants  . . . . . . . . . . . . . . Appendix D

Standard Abbreviations/Terms (BP-337) . . . . . . . . Appendix E

Parolable Institutions  . . . . . . . . . . . . . . . Appendix F

Drug Organizer/Leader Explanation of Functions  . . . Appendix G

Request for Transfer/Application of Management  . . Attachment A
    Variable (EMS 409)

**CUSTODY CLASSIFICATION FORM INSTRUCTIONS - MALE (BP-338)**

## INTRODUCTION

Custody classification is a procedure whereby inmates are assigned levels according to their criminal histories and institutional behavior/adjustment. An inmate's custody level is an indication of how much staff supervision is required for an inmate within and beyond the confines of the institution.

An inmate's initial custody classification shall be scored at the first program review following initial classification (approximately 7 months after arrival at an institution). Subsequent reviews shall occur at least every 12 months, but may be conducted earlier in order to enable progress toward community activities. Custody classification shall ordinarily occur in conjunction with every second program review.

Ordinarily, an inmate's security level and custody level shall be reviewed following any new sentence or sentence reduction, or any time a change in external factors or disciplinary action might affect the security or custody level.

When transferring to another institution, inmates normally retain their custody assignments. If the custody level is inconsistent with that authorized at the receiving institution, the sending institution shall change the inmate's custody prior to transfer. Holdovers shall retain their custody level assignments until received at the designated institution.

At each annual custody review, a new Custody Classification Form shall be completed, even though the scoring elements may not have changed from the previous form. Only the most current Custody Classification Form shall be retained in the Inmate Central File, except for those forms that must be retained to document appropriate review and approval for custody reductions (e.g., custody reductions for exception cases require the Warden, or designee, to sign the Custody Classification Form. The form should be maintained to document the review and approval). As set forth in the definition of maximum custody, Chapter 2, a BP-338 form changing custody to or from maximum custody must be permanently maintained.

It should be clearly understood that the Custody Classification Form only recommends an inmate's custody. The unit team and/or Warden is the final review authority. The intent of the Custody Classification system is to permit staff to use professional judgment within specific guidelines. Custody changes are not dictated by the point total. However, when the unit team decides not to follow the recommendation of the point total, they must

If approved for transfer, the Designator will enter the required information and note the approved institution transfer code on the "Enter Redesignation" screen.  The method of transportation is at the discretion of the Warden.

Designators should use the below Redesignation Matrix to assist with redesignation decision making.

**Table 10-1**

| REDESIGNATION MATRIX | | | | |
|---|---|---|---|---|
| Routine Initial Designation | Closest to Legal Residence | Population Equally Distributed | Primary: Closest to Legal Residence Secondary: Population Equally Distributed | Primary: Population Equally Distributed Secondary: Closest to Legal Residence |
| Disciplinary | | X | | |
| Close Supervision | | | | X |
| Lesser Security * | | | X* | |
| Greater Security | | | | X |
| Adjustment | | X | | |
| CIMS | | | X | |
| Nearer Release ** | | | X** | |
| Program Participation | | | | X |
| Program Completion | | | X | |

* For a lesser Security Transfer, the inmate will ordinarily be transferred even when there is no available bed in a facility within the 500-mile radius from the inmate's legal residence.

This is more cost-effective than allowing the inmate to remain at the higher level facility with a Management Variable unless the inmate is within 18 months of release.

\** When considering an inmate for a nearer to release transfer, the inmate should not currently be housed within a 500-mile radius of his legal residence, and the requested transfer should place the inmate within the 500-mile radius. If the transfer is denied, no additional request for redesignation may be submitted until one year has elapsed since the date of the denial. Lastly, inmates will be considered for a nearer to release transfer after serving 18 months of clear conduct.
                                                                                  \*

  e.  **Institution Classification**

    (1)  **Security Changes**

       (a)  A decreased security level may be indicated by a decrease in the security total of the Custody Classification Form.  This change may result in transfer of the inmate to a lower security level institution.

       (b)  An increased security level may be indicated in a similar fashion.  The security total may increase to a higher security level range.

  If an updated security scoring, combined with Public Safety Factors, indicate that an inmate is rated at a different security level, the inmate must be referred to the Regional Designator for either transfer or application of a Management Variable.  For example, if an inmate in a Low security level institution is reclassified to Minimum security, the case must be referred for transfer or application of a Management Variable.  If transfer is denied, the regional office shall apply an appropriate Management Variable and add a Management Security Level, if applicable.

    (2)  **Custody Changes**.  During an inmate's custody review, a custody level may be increased or decreased (ordinarily, only one level at a time) indicating a transfer is appropriate.  For example:

       (a)  A Medium security level inmate has OUT custody, and becomes eligible for COMMUNITY custody.  If the Unit Team decides to reduce custody, the inmate would normally be referred for redesignation to a Low or Minimum security level facility, since Medium security level institutions do not house COMMUNITY custody inmates.  **If approved for transfer by the Regional Office, the Management Variable of**

## DISCONTINUED PUBLIC SAFETY FACTORS

**D**    Firearms

**E**    High Drug

**J**    Designation Assessment

**REQUEST FOR PUBLIC SAFETY FACTOR WAIVER.**  Only the Regional
Director or designee is authorized to waive a PSF.  A request for
waiver of a PSF shall be submitted to the Regional Office via
GroupWise form EMS 409, available on BOPDOCS.  The form shall be
completed as described below:

(1)  This item should indicate the request is for waiver of
a Public Safety Factor.

(2)  This item should indicate whether the inmate agrees
with the recommended team action.  If appropriate, an explanation
should be provided.

(3)  This item should include current, complete, and
accurate information concerning any medical problems the inmate
is experiencing.

(4)  This item should include a brief description of the
inmate's adjustment during this period of incarceration.

(5)  This item should provide disciplinary information
including all actions reflected on the current Custody
Classification Form (BP-338).  Significant histories should be
summarized.

(6)  It is important that the rationale include complete and
specific information providing justification to support the
requested action.

(7)  Indicate whether or not the inmate is eligible for a
parole hearing.  If yes, indicate the date of the hearing.

PS 5100.07
CN-2 1/31/2002
Appendix G, Page 1

```
┌─────────────────────────────────────────────────┐
│            DRUG ORGANIZER/LEADER                  │
│     EXPLANATION OF FUNCTION DEFINITIONS           │
└─────────────────────────────────────────────────┘
```

Read the
"Offense Conduct" section of the PSI and any other available
information to understand what the inmate did in the criminal
activity.  The functions are listed in descending order of
SERIOUSNESS.

```
┌─────────────────────────────────────────────┐
│            DRUG ORGANIZER/LEADER              │
└─────────────────────────────────────────────┘
```

**Importer/High-Level Supplier:** imports or otherwise supplies large
quantities of drugs; is at or near the top of the distribution
chain; has ownership interest in drugs (not merely transporting
drugs for another individual); usually supplies drugs to other
drug distributors and does not deal in retail amounts; may employ
no or very few subordinates.

**Organizer/Leader:** organizes, leads, directs, or otherwise runs a
drug distribution organization.  Receives the largest share of
the profits and has the greatest decision-making authority.

**Grower/Manufacturer:** grows, cultivates, or manufactures a
controlled substance, and is the principal owner of the drugs.
(Keep in mind, the intent of this definition is to capture the
individual who has the capability to manufacture enormous amounts
of drugs in his garage/lab for example, and not the individual
who is growing only five marijuana plants in his basement.)

**Financier/Money Launderer:** provides money for purchase,
importation, manufacture, cultivation, transportation, or
distribution of drugs; launders proceeds of drug sales or
purchases.

**Aircraft Pilot/Vessel Captain:** pilots vessel or aircraft;
requires special skill; does not include inmate who is the only
participant directing a small boat (i.e., a speed boat) onto
which drugs had been loaded from a "mother ship" (such person is
a courier).

PS 5100.07
CN-2 1/31/2002
Appendix G, Page 2

---

**NOT A DRUG ORGANIZER/LEADER**

---

**Manager:** serves as a lieutenant to assist one of the above; manages all or a significant portion of the manufacturing, importation, or distribution operation; takes instructions from one of the above and conveys to subordinates; directly supervises at least one other co-participant in an organization of at least five co-participants.

**Bodyguard/Strongman/Debt Collector:** provides physical and personal security for another co-participant in the offense; collects debts owed, or punishes recalcitrant persons.

**Chemists/Cooks/Chemical Supplier:** produces LSD, methamphetamine, crack cocaine, or other illegal drugs, but does not qualify as a Grower/Manufacturer because he/she is not the principal owner of the drugs.  Chemical supplier does not handle drugs themselves but engages in the unlawful diversion, sale, or furnishing of listed chemicals or equipment used in the synthesis or manufacturing of controlled substances.

**Supervisor:** supervises at least one other co-participant, however, has limited authority and does not qualify as a Manager.

**Street-Level Dealer:** distributes retail quantities directly to the user.

**Broker/Steerer/Go-Between:** arranges for two parties to buy/sell drugs, or directs potential buyer to a potential seller.

**Courier:** transports or carries drugs with the assistance of a vehicle or other equipment.  Includes situations where inmate, who is otherwise considered to be a crew member, is the only participant directing a vessel (e.g., a speed boat) onto which drugs had been loaded from a "mother ship".

**Mule:** transports or carries drugs internally or on their person, often by airplane, or by walking across a boarder.  Also includes an inmate who only transports or carries drugs in baggage, souvenirs, clothing, or otherwise.

**Renter/Storer:** provides (for profit/compensation) own residence, structures (barns, storage bins, buildings), land, or equipment for use to further the offense.  This inmate is distinguished from the enabler because he/she is paid (in some way) for his/her services.

PS 5100.07
CN-2 1/31/2002
Appendix G, Page 3

**Money runner:** transports/carries money and/or drugs to and from the street-level dealer.

**Off-loader/Loader:** performs the physical labor required to put large quantities of drugs into storage, hiding, or onto some mode of transportation.

**Gopher/Lookout/Deckhand/Worker/Employee:** performs very limited, low-level function in the offense (whether or not ongoing); includes running errands, answering the telephone, receiving packages, packaging the drugs, manual labor, acting as lookout to provide early warnings during meetings, exchanges, or off-loading, or acting as deckhand/crew member on vessel or aircraft used to transport large quantities of drugs.

**Enabler** (Passive): plays no more than a passive role in the offense, knowingly permitting a certain unlawful criminal activity to take place without actually being involved with the activity; may be coerced or unduly influenced to play such a function (e.g., a parent or grandparent threatened with displacement from a home unless they permit the activity to take place), or may do so as "a favor" (without compensation).

**User Only:** possessed small amount of drugs apparently for personal use only; no apparent function in any conspiratorial criminal activity.

**Wholesaler:** sells more than retail/user-level quantities (greater than one ounce) in a single transaction.